State vs. Anderson.

No.

THE STATE VS. THOMAS C. ANDERSON.

30 557
47 415

30 557
e114 319

30 557
f120 140

It is not necessary that an examination of the accused before a committing magistrate should be had, preliminary to the finding of an indictment, or the filing of an information against him.

Under the constitution of Louisiana the prosecution of all offenses, except capital offenses, may be initiated on information filed by the public prosecutor, with leave of the court. This information need not be supported by affidavits.

The amendment of the constitution of the United States requiring the intervention of a grand jury, relates only to crimes cognizable by the United States courts, and to criminal proceedings in those courts.

The law authorizing the judges of certain district courts in the parish of Orleans to appoint commissioners to select competent men to serve as jurors, does not violate any clause of the constitution limiting the courts to the exercise of purely judicial functions.

Where it is charged in an information that a certain instrument, created by special statute with specific and distinctive features, has been uttered, and falsely published as true, it must be shown, in order to maintain the charge, that the identical instrument thus created, has been thus uttered and published. It does not maintain the charge to prove that *another* instrument has been uttered and falsely published, no matter how close its resemblance to the instrument created by the statute and described in the information.

Before the utterance or publication as true of a certain false and altered instrument can constitute a crime, it must be made to appear that if genuine, it would be evidence of the fact it recites; and that it does, or may tend to prejudice the rights of another.

Under the act regulating elections in this State, enacted in November, 1872, the " consolidated statement of votes made by a supervisor of registration," is not evidence of the result of any election.

*Quære.*—Whether the consolidated statement, or returns of a supervisor of registration might not be receivable in evidence in an *election* contest as secondary, or even as the best evidence, in the absence or loss of the returns of the commissioners of election?

Where it appears that the utterance and publication as true of a false and altered instrument, can only tend to anybody's prejudice if so uttered and published by the accused in a *certain official capacity*, the failure to charge in the information that the offense was committed by the accused in that official capacity, will render the information fatally defective.

Whether a certain instrument is, or is not a public record, is a question of law for the court to determine.

The criminal statutes of this State make it a crime to *alter* a record ; they also make it a crime to falsely *publish* as true, an altered record, but there is no such crime known to the law of Louisiana as " uttering and publishing" as true, an altered, false and counterfeited instrument.

APPEAL from the Superior Criminal Court, parish of Orleans. *Whitaker*, J.

*H. N. Ogden*, Attorney General, and *J. C. Egan*, Assistant Attorney General, for the State.

*Cullom & Castellanos* and *John Ray* for defendant.

The opinion of the court was delivered by

MANNING, C. J. The defendant, having been convicted of the crime

hereinafter set forth, was sentenced to two years' confinement in the Penitentiary, from which he has appealed.

The offence charged in the information is, that he did falsely and feloniously utter and publish as true a certain altered, false, forged and counterfeited public record, to wit: The returns from the parish of Vernon of an election held for Presidential electors, in the State of Louisiana, on the seventh day of November, 1876, as shewn by the original returns of said election made by the supervisor of election for the parish of Vernon, knowing the same to be false, altered, forged and counterfeited, with intent to injure and defraud, etc.

The case comes up upon numerous bills of exception and an assignment of errors. We shall confine our examination to such of them only as are necessary to the decision of the issue presented to us.

The prosecution was commenced by an information filed by the District Attorney for the parish of Orleans, and it is objected on behalf of the prisoner that the filing of an information is not allowable, because— first, there has never been a preliminary examination of any specific charge against him, and that he did not waive such examination, and has not had an opportunity of meeting the witnesses against him and of cross-examining them; second, there has not been any finding by an examining officer that the offence charged has been committed, nor any adjudication by such officer, that the prisoner was guilty thereof; third, the information filed is a flagrant violation of section 1010 Revised Statutes of 1870.

That section merely provides how preliminary examinations before committing magistrates shall be conducted, and is much the same as the statute of other States upon that subject.

The objections are not well founded. It has never been supposed that a preliminary examination by a committing magistrate was an indispensable precursor to a prosecution either by indictment or information. One of the counsel for the prisoner argued orally a very different objection, viz.: that, as our criminal mode of procedure was as at common law, and informations could not be filed without leave of the Queen's Bench, which was granted only upon proper affidavits, therefore an information can not be filed here unless a similar course is pursued.

In England there are two classes of informations—government informations, and those emanating from private individuals. There is no local officer there whose duties are the same as those of district attorneys in the States of this country, or solicitors, as they are called in some of them. That office is the creation of the American system. The Attorney General of England filed informations on behalf of the government *ex officio*, but others were filed at the instigation of private indi-

viduals, and by counsel on their behalf, and though the prosecution is in the name of the sovereign, those individuals who provoked it were mulcted in costs if it failed. By the common law it was in the power of any individual to file an information without disclosing to the court the grounds on which it was exhibited. 1 Chitty Crim. Law, 856. The frequent exercise of this power by private individuals from motives of malice or private revenge provoked the statute 4 and 5 W. and M., by which private individuals were henceforth prohibited from filing informations without the consent of the King's Bench.

There was a reason, therefore, for requiring in England an information to be supported by affidavits before permission to file it would be given, that does not exist here. No one can file an information here but the law officer. The public prosecutor, by whatever designation he may be known, is the only person who can initiate a criminal proceeding in that way, and as he is acting under the sanction and responsibility of his office, the same restrictions are not imposed upon him as were wisely imposed by the statute of William and Mary, which changed the common law on that subject.

If the Attorney General of England were now to offer to file an information in the Court of Queen's Bench, he would not be required to accompany it with affidavits; while, if offered by a private person, through his counsel (for he can not do it in person), the court requires to be informed *aliunde* if there is reasonable ground for it. 1 Chitty C. L. 859. Nevertheless, our statute still requires that the consent of the court shall first be obtained, and in practice (here at least) it is granted as a matter of course.

Every constitution of this State has contained the provision that prosecutions shall be by indictment or information. Our statute restricts the latter to offences not capital, and requires the consent of the court to be first obtained; but that being done, and there is no mode prescribed for obtaining it, the prosecution by information has never been doubted to be of equal validity under our law with that of indictment for any offence not capital. It was very early held here that the amendment to the Federal constitution, which requires the intervention of a grand jury, relates only to crimes cognizable by the United States courts, and to criminal proceedings in those courts. Territory vs. Hattick, 2 Mart. 88. And in 1859 a case was brought up wherein the Grand Jury had ignored a bill for manslaughter, and immediately thereafter, on the same day, the district attorney filed an information charging the defendant with that offence. A motion to quash, on the ground that the Grand Jury had ignored a bill against the same party for the same offence, was sustained by the lower court, and the State appealed. Held, that the State was not barred from proceeding by

State vs. Anderson.

information, notwithstanding the Grand Jury had ignored the indict-
ment. State vs. Ross, 14 Annual, 364. It may be doubted if that is.
not going too far, and we should probably not have ruled thus if the·
point had been presented to us, but the ruling is cited merely to shew
to what extent the practice of prosecuting criminally by information has
been sanctioned.

There was no reason why a practice thus sanctioned, and uninter-
ruptedly prevailing in our courts from their organization, should not.
have been adopted in initiating this prosecution, but we are informed at·
the bar by the Attorney General, that the Grand Jury, in place of find-
ing a bill, instructed the prosecuting officer to file an information, thus.
giving its sanction to this prosecution, and forbearing to initiate it by
indictment, solely because of some apprehended defect or want of power
to act after the time had elapsed for which the jury was summoned.

The prisoner challenged the *venire*, on the ground that the selection
of jurors by commissioners appointed by the judges, as directed by the·
act of 1877, is illegal, the constitution having prohibited that any duties.
or functions other than judicial shall ever be attached by law to the·
courts. The act provides that the judges of five courts of Orleans par-
ish shall select two jury commissioners, who in their turn shall select,.
Impartially, not less than one thousand competent men as jurors from
the citizens of the parish, having the qualifications requisite to register
as voters. Acts p. 73. Experience has demonstrated the necessity of
some law to protect the administration of justice from the evil effects of
a system which had so far departed from the old landmarks as to admit
every man into the jury-box who could use the ballot. This evil was.
apparent years ago, when ignorant or vicious white men only were
intrusted with this privilege, and it was immeasurably augmented by
the changes that have since occurred, by which the number of improper
persons, eligible to this grave duty, has been multiplied. The Congress
of the United States found a solution of the pressing difficulty by pro-
viding for the appointment by the judge of commissioners to select a
given number of jurors, and our Legislature wisely acted on that hint,.
and copied the enactment. It seems to us a function peculiarly apper-
taining to the judge of a court, and when we remember that the same
Constitution which confines the Supreme and District Courts to the exer-
cise of judicial duties, confers upon the former the power to select its.
own clerk, it is apparent that an act of the Legislature, conferring upon
the latter the power to select jury commissioners, to make up a body
from which the jurors of their courts are to be drawn, is not in contra-
vention of its prohibition of the performance of other duties than those
which are judicial. And that this power has not been exercised in the
spirit of the law, and for the public good, is not pretended.

State vs. Anderson.

We have said thus much upon those points of the defence which affect particularly the constitution of the tribunal, and the kind of proceeding by and through which the trial was had, to the end that the rightfulness of the one and the legality of the other may be vindicated. We now turn to the investigation of some of the alleged defects which the prisoner claims vitiate the prosecution, and here it is necessary to state succinctly the requirements of the statute touching elections, in order to understand the nature of the objections.

Three commissioners are appointed for each poll, whose duty is to count the votes immediately upon its close; to make duplicate lists of them, with very minute specifications of certain details, and deliver one of them to the supervisor of registration of the parish and the other to the clerk of the District Court. The supervisor of registration within twenty-four hours thereafter, must consolidate such returns, to be certified as correct by the clerk of the District Court, and he must forward the consolidated returns, with the originals received by him, to the returning officers. These officers, known in common parlance as the Returning Board, must meet in New Orleans within ten days after the closing of the election, and canvass and compile the statement of votes made by the commissioners of election. The presiding officer (of this board) shall open in the presence of its members the statements of the commissioners of election, and they shall from said statements canvass and compile the returns of the election in duplicate, deposit one in the office of the Secretary of State, and make public proclamation of the other by printing in the official journal. Acts 1873, p. 15. The act was approved November 20, 1872.

The offence charged in the information is uttering and publishing as true a certain altered public record, to wit: the returns from the parish of Vernon, as shewn by the original returns of said election made by the supervisor of election.

When the State offered in evidence the alleged public record, the defendant objected on the ground that it did not conform to the description contained in the information; or, in other words, that it was not the record for the uttering and publishing of which, altered and forged, he was criminally charged. Thereupon the State moved to amend by striking out the words "original returns," and inserting "consolidated statement of votes, parish of Vernon," in lieu thereof, and by striking out the words "supervisor of election," and inserting in their stead "supervisor of registration."

The amendment was permitted, and the trial proceeded on the information as amended, and a bill was reserved. We do not propose to consider the right to amend because the situation of the accused, though changed, was improved by the substitution and his chances of

36

escape increased.   The document was again offered in evidence under the amendment and received.

Whenever forgery of an instrument, or the uttering of a forged instrument is charged, and the instrument has a legal definition and meaning—that is to say, has certain characteristics or qualities imparted to it by law—it is not needful to set it forth in the information with minute precision, because the general or legal term by which it is known sufficiently designates the kind of instrument meant.   Thus, a bond or a will is an instrument known to the law, and the law dictates what shall be known and held to be a bond or a will.   But when a statute provides for an instrument, not known to the law hitherto, or in other words, creates it and impresses upon it certain features peculiar to itself, forgery can not be committed by making a false statutory one in a form not provided by the statute, even though it be so like the genuine one as to deceive most persons, and the uttering of such false and altered instrument would not be punishable.   2 Bishop Crim. Law, sec. 506.

Under our statute it is only necessary to set out the purport of any instrument, or to designate it by name, if it is usually known by one, in an indictment for forging, uttering, etc.   Rev. Stats., 1870, sec. 1049. But in order to be forgery, the instrument thus set out and charged to be feloniously made, must be of such character that, if genuine, it would be evidence of the fact it recites.   The instrument must be such that when forged, it does or may tend to prejudice the rights of another, or, as put by Bishop, it must either appear on its face to be, or it must in fact be, one which, if true, would be legally capable of effecting a fraud, 2 Bish. C. L. secs. 503, 511; State vs. Smith, 8 Yerg. 150; Barnum vs. State, 15 Ohio 717; State vs. Snow, not yet reported.

The instrument charged in the amended information as having been falsely uttered, is the " consolidated statement of votes, parish of Vernon, made by the supervisor of registration."   The statute nowhere gives to this consolidated statement any efficacy or value as evidence of the result of the election, nor does it anywhere direct or permit it to be used as a means of ascertaining such result.   The returning officers are not required to use it.   The instrument or documents they are required to canvass are the original returns of the commissioners, and from them, and them alone, they must compile the vote.   The preservation of this " consolidated statement" of the "supervisor of registration" among the archives of either parish or State is not commanded.   The clerk of court is not furnished with a duplicate, as he is of the commissioners' returns.   There is no officer who is authorized by law to give a certified copy of it for use as evidence, or for any other use.   The clerk is directed to certify it as correct, and this appears to have been required so that it may be known to conform to the duplicate list of commis-

sioners' returns in his office; and after it is so certified, the supervisor transmits it to the returning officers along with the original returns sent him by the commissioners, and from the latter alone they compile the vote.

If the supervisors of registration of every parish in the State should alter and forge every consolidated statement of votes made by each one respectively, and transmit them thus altered and forged, to the return ing officers, and these officers should canvass and compile the votes, as the statute requires, not from these consolidated statements, but from the unaltered commissioners' returns, no injury would be suffered by any individual or by the body politic. The supervisors' consolidated statement is not made by the statute the basis of the final canvass and compilation of the vote, as the original returns of the commissioners are, and hence the alteration and forgery of all of them, the returns of the commissioners remaining unaltered, would not change the result of the election in any parish. To constitute forgery, the forged instrument must be one which, if genuine, may injure another, and this must appear, either from the description of the instrument, or by the averment of matter *aliunde*. Where, from aught that appears in the information, the instrument was a *nudum pactum*, or of no effect, forgery can not be predicated upon it. People vs. Tomlinson, 35 Cal., 503. And the same principle, of course, applies to the uttering of a forged instrument.

It is unnecessary for us to say whether the consolidated returns of the supervisor of registration, without the clerk's certificate, is or is not a public record, susceptible of forgery. It is sufficient to remark that the paper offered in evidence is not the instrument, the utterance of which as forged is charged upon the defendant in either the original or amended information.

After conviction a motion in arrest of judgment was made, because it was not charged in the information, either in its original form, or as amended, that the uttering or publishing the alleged altered and forged instrument was done by the defendant in any official capacity, either as one of the returning officers, or in any capacity other than as an individual, and that such offence could only have been committed in an official capacity to operate an injury to, or fraud upon any person or body politic.

It is manifest that the uttering and publishing by a private person, or by a person in any public capacity other than that of returning officer of elections, could not have injured or defrauded any one. Suppose that four presidents of as many banks in this city had uttered and published as true, altered and forged consolidated statements of votes of any parish at an election, as made

by the supervisor of registration, and had caused the same to be printed in the official journal under their signatures as presidents of the banks, would they have been indictable therefor under the statute? And why not? Simply because they had no legal mission or authority to do that act, and as no legal effect would be produced by it, no one would be injured or defrauded by it. Every one is presumed to know the law, and therefore to know that the persons, thus uttering and publishing, were without authority to do that particular act, and that it was void, and of no effect when done. Hence it is of the essence of this crime, that it should have been committed by a public officer, whose function was to prepare and publish the true canvass and compilation of votes, and the averment that he uttered and published the false canvass and compilation in his official capacity, and under color of his office, is essential in an information to support a conviction, and justify a judgment thereon. The information has not such averment.

The charge of the judge below, which is admirable in its judicial tone and temper, though, as we have seen, erroneous on the questions of law we have reviewed, proceeds throughout on the idea or assumption that the act charged in the information as criminal was done in the defendant's official capacity. Even the instructions asked by the defendant's counsel are based on that idea. It was nowhere so charged.

It is not needful to say more for the decision of this cause, nor were we inclined to advert to any of its features, other than those directly presented by the record, but we are driven from this reticent attitude by having spread before us in the printed argument of some of the defendant's counsel an open letter, dated "Washington, February 4, 1878," addressed to the prisoner, and signed by John Sherman, Stanley Matthews and others, in which the public, and the people from which the jurors are to be drawn for his trial, is informed that he is falsely accused and maliciously persecuted.

A few years ago—it was within the present decade—a member of the British Parliament undertook to influence the course of a public prosecution, then pending in an English court, against a fraudulent claimant of the honors and estates of an ancient house. The criminal trial there, as here, had been preceded by a civil proceeding, and both were of unexampled duration, so that the question, who was the rightful heir of the Tichborne family, had extended beyond the legal circle, and had invaded social and political life.

When the unwarrantable publication had been made by the member of Parliament under his own signature, in which he had endeavored to bring opprobrium upon the court and its officers by charging that the claimant was falsely accused and maliciously prosecuted, the Lord Chief Justice Cockburn promptly repressed his impertinent, though not

interested, zeal by inflicting upon him a fine of £250, and sentenced him, in default of payment, to imprisonment in the county jail.

He.went to jail, and there remained until a relative released him by paying his fine. On the re-assembling of Parliament at its next session, the judge formally communicated his action to the House of Commons, that it might be officially known he had not wantonly invaded its privileges, and that body, ever watchful over the inviolability of those privileges, silently approved the judge's vindication of the sanctity of his court.

Public opinion, in this instance and in this country, can alone exercise that punitive power, the employment of which is equally well merited on both occasions.

It is ordered, adjudged and decreed, that the judgment and sentence of the lower court is avoided and reversed, that the verdict of the jury is set aside, and that the prisoner be discharged from custody.

## ON APPLICATION FOR REHEARING.

The ATTORNEY GENERAL applied for a rehearing, and presented a brief in support of his application, of which the concluding sentences are;—

This case, from its great importance, must become a leading one, not only at home but abroad. It is freighted with the most important interests, both of our State and country. Let it contain no assertion of principle which can not be defended by the candid jurist in every quarter of the civilized world. If the prisoner is entitled to his freedom upon the grounds of reason and of law, let an independent judiciary see to it that that freedom is secured to him. But if, on the contrary, he can only escape the penalty of his crimes by the application of principles not strictly consonant to the well-established rules of criminal procedure throughout the world, let it not be said that this high and honored tribunal defeated by hasty and ill-founded conclusions of law the great ends of justice.

From the commencement of this prosecution I have endeavored simply to discharge my duty, as I understood it, to the State, to the courts, and to myself. I have not thought that considerations of mere expediency or policy should exercise the slightest influence upon my conduct. I have tried to be just to the State and just to the accused. My duty is now done and I leave the matter in your hands for final disposition according to law.

The opinion of the court, on the application for a rehearing, was delivered by

MANNING, C. J. The importance of the legal principles involved in this cause, and the grave and far-reaching consequences of our application of them to the prosecution of the defendant, have induced us to reconsider the grounds upon which our decision is based, with the same

(1)

circumspection with which we examined them on the hearing. We have given careful attention to the argument of the Attorney General for a rehearing, weighing each branch of it in its turn, and consulting each authority cited. In fulfillment of our manifest duty, of which he reminds us, to permit no considerations whatever to intervene between us and the proper discharge of our judicial function, we shall proceed to review the reasons offered us to effect a change of our judgment.

It must be observed on the threshold of this inquiry that a considerable part of the printed argument for rehearing is directed to the refutation of a dictum not made by us. Whether the instrument charged to have been uttered as forged is or is not a public record, susceptible of forgery—or whether, not being a public record without the clerk's certificate, it would be one with it—are questions we not only did not decide, but we expressly and in unequivocal language announced that it was unnecessary in this case for us to decide. So too, of those portions of the brief which treat of the crime charged as being forgery (as, for example, this, "the paper charged to have been altered or falsified is a paper which the Supervisor," etc.,) it ought to be superfluous to say that the defendant was not charged with forging any record, public or private, nor for forging any paper of any kind whatever. That is not the crime for the perpetration of which he was tried, nor of which he was convicted.

A supplemental brief for rehearing has also been presented by the Attorney General, in which he suggests short notice of the setting of the cause as one of the reasons why he urges a rehearing, and says his reference to the action of the court in setting the case was made in no spirit of complaint of that action, and that he is informed by the Assistant Attorney General that the day assigned for the argument may have been fixed by the court with reference to his suggestion made on the day the cause was first called. Such was the fact. The cause was a second time set for argument, and was heard a day later than that on which the Assistant Attorney General was willing to take it up, and two weeks lacking one day after it was first called.

On the day for which it was first set, it went over, at the written request of the Attorney General, and it was then that his Assistant announced in open court that he had proposed to the counsel of the accused to take up the case on the following Monday. We ordered it set for Tuesday, to be sure of giving to the State all the time that was needed or desired. The clerk was instructed to give written notice thereof to both of the State's counsel, and it was done. No further time was asked on the part of the State, and no intimation was given to us that further time was desired. On the contrary, we were given to understand that the Attorney General desired no further postponement. On the hearing, we had the assistance of oral arguments from the Attorney

State vs. Anderson.

General and from his Assistant, the time being extended by the court beyond that allowed by the rules, and we also had the benefit of their elaborate printed brief, placed before us at the same time.

The first position taken by the Attorney General is, that what is a record is matter of fact for the jury exclusively to find, and not matter of law for the court to decide.

A public record is a written instrument, made by a public officer as directed by law, to serve as a memorial and evidence of something written, said, or done. Of necessity, the forms and verifications of these public instruments are prescribed by law. Evidence may be received to shew that a paper having the form and appearance of a public record was or was not in fact what it purports to be, or to shew its custody in a public office, or the like; but whether a given document possesses the form and character of a public record is to be determined by its conformity to the statute directing its confection, if it be a statutory instrument, or to the general law, if it be an ordinary legal instrument, and is from its nature a question of law. The proposition that when the general law or a special statute has prescribed the form and manner of making a public instrument, and has directed how it shall be verified, the question of its conformity to the general or special statute is one of fact to be decided by a jury, is destructive of the distinction immemorially recognized between matters of law and fact, and subversive of fundamental principles. Under the operation of such a principle a court would be without power or authority to decide whether the form and substance of an indictment or information (for these are public records) were sufficient under the law. It would have been extraordinary if so high an authority as Chief Justice Parker had sanctioned such doctrine, and he is the only author or jurist cited to support it in the printed brief, and if his language had been given in full, as we shall give it, the identical case cited is shewn to be in accord with the well-established rule. It is Brier vs. Woodbury, 1 Pick, 362, and is cited with the observation that it is conclusive of the question, whether an instrument is or is not a public record, is a question of fact. The sentence quoted is: "A record is conclusive evidence, but what is or is not a record, is matter of evidence, and may be proved like other facts; otherwise there would be no remedy."

The words immediately following and not quoted are: "On the plea of *nul tiel record*, the fact is to be judged of *by the court*," etc., p. 367.

It has been held time and again that the uttering and publishing a forged instrument, purporting to be a cheque, will, deed, bond or certificate, is not indictable unless the forged instrument, on its face, is clothed with the forms prescribed by law, and it has nowhere been held that the question whether the forged instrument has or has not the form and requisites of a cheque, will, deed, bond or certificate, is one of fact and not of law.

Thus;—a party was indicted for forging a bank cheque. The cheque on its face was not payable to bearer, or to the order of any person

named. Held that the cheque was incomplete and could not defraud any one, and that therefore the prosecution must fail. Williams vs. State, 51 Ga., 535. In an indictment for forging a will, it appearing that the forged instrument had not the number of witnesses required for a valid will, a conviction can not be sustained. 2 Bishop Crim. Law, sec. 506. If a deed be void on its face, forgery of it is not indictable, nor the uttering it as forged. 14 Tex., 503. If a bond is not required by law to have an attesting witness, and the name of one is falsely subscribed thereto, it is not forgery, because the presence or absence of a witness' signature does not affect the validity of the bond. State vs. Gherkin, 7 Ired, 206. An indictment for forging a certificate of the acknowledgment by one L. of a certain mortgage, when the certificate was by one K., commissioner of deeds, and it had no venue, and there was nothing on its face to shew of what county K. was a commissioner, was held to be bad. Vincent vs. People, 5 Parker, 88. An indictment for forgery of an order for $48 is not sustained by an order offered in evidence of $49. State vs. Handy, 2 App., 81. In an indictment for forging a railroad ticket, expressed on its face to be "good for this day only," a description of the ticket, as signifying to the holder that it must be used continuously and without stopping at intermediate stations after once entering the cars, is a fatal variance. Com. vs. Ray, 3 Gray (Mass), 441. The special object and purpose of the law requiring the tenor or purport of a forged instrument to be set out in the indictment, is that the court may judge of its character and apply the law to it. Walton vs. State, 8 Yerg, 371.

It is then manifest that the question whether a forged paper possesses the legal requisites of any of these instruments is one of law, and not of fact. Authorities of the same tenor might be multiplied until the mere reading of the citations would be tedious. It will be sufficient to refer to collations of them in Archbold's Crim. Prac. and Pl. Waterman's Notes, 534—563; Hanes' U. S. Dig. Crim. Cas. 192 *et seq;* Wharton's Crim. Law, sec. 307, 607.

We must not omit mention of the case to which the brief on the part of the State has especially referred us, as establishing the doctrine that forgery may be committed of any writings of every description—a general proposition neither affirmed nor denied by us, and one not at all affected by our ruling in this case, and not the point at issue in that.

The case is the People vs. Fitch, 1 Wend. 198, the syllabus of which we transcribe entire, that it may be seen how fully and unqualifiedly it supports the doctrine elaborately discussed and approved in our first opinion: "Where an order for the delivery of goods was accepted and paid, and returned to the drawer, and the date of it subsequently altered by him, such alteration held not to be forgery at common law, although manifestly done with a fraudulent intent. To constitute forgery in such case, the act must have a tendency to effectuate the intended fraud. An order, satisfied by the delivery of the goods, in the hands of the drawer, in legal acceptation is no instrument, and an alteration of its date is no false making. It is what it purports to be."

It is necessary to state anew what crime the prisoner is charged

State vs. Anderson.

with. It is that of uttering and publishing as true a certain altered, forged and counterfeited public record, to wit: the consolidated returns of the parish of Vernon, made by the supervisor of registration. It will also be useful to restate the election law *quoad* the two instruments or records provided for by it. One is the commissioners' returns, viz: the returns of each poll in a parish made by the commissioners who held the election at that poll. The other is the consolidated returns made by the supervisor of registration of each parish from the commissioners' returns of all the polls in the parish, and as consolidated, certified by the clerk of the District Court to be correct.

This last is therefore a document or record required by law to have a double verification, by two different officers, who are able and who are required to verify it from two different sources of information. Now in order to ascertain whether a certain paper possesses the form and requisites of this consolidated (statement or) returns of the supervisors, we must first see what form the statute prescribes for it, and what requisites the statute says it must have, and the determination of the question whether the paper conforms to the statute, and has the form and requisites set forth in the statute, rests with the court, and is purely one of law.

We held that the paper, offered as the record which had been uttered as true, and which comes up to us as part of one of the bills of exception, did not conform to the description in the statute of a consolidated statement of votes—that it had not the form and verification required by the statute, as a paper purporting to be a will with only one witness would not be a will—that the paper produced, not having the certificate of the clerk of the district court, was not the paper described and charged in the information, and was not what was known to the law, and described in it, as the consolidated returns or statement of votes, and, therefore, the paper offered was not receivable in evidence under, and does not sustain the charge, as laid in the information, just as a cheque, deed, bond, or certificate, not having the legal form of such instruments, would not sustain a charge of uttering and publishing as true a forged cheque, deed, bond or certificate.

The amendment of the information in the present case is of itself an example of an attempt to conform to the rule we have been elucidating and enforcing. It is not the commissioners' returns which are to be signed by them alone, and to be certified by no one, that the prisoner was tried for uttering as true. That was the instrument which he was charged with uttering as true, having been altered and forged, in the information as first drawn, but the State amended by striking out the description of that instrument, and inserting in its stead the consolidated statement of the supervisor, which is required to be made by that officer, and to be certified by the clerk of the court. When the document thus made the basis of prosecution, was offered in evidence, it turned out that it had not the clerk's certificate, and thus lacked one of the insignia required by the statute, and it does not matter whether the document as

thus offered was or was not a public record. It is enough, and it is conclusive, if the instrument offered is not the statutory instrument charged. And hence we said before, it is not necessary to decide whether the instrument charged is or is not a public record susceptible of forgery. The instrument offered to support the charge is not the instrument described in the statute. The statute describes a paper which shall have the supervisor's signature, and the district court clerk's certificate. The paper offered in evidence has the former and has not the latter.

It is entirely beside our present inquiry whether the clerk's signature to the supervisor's returns would have made it *a* public record, or whether it is not *a* public record without such certificate. Our opinion expressly pretermits the decision of that question in language designedly used. But we held that since the statute commands that these returns shall be certified by the clerk of the court, and the instrument offered had not that certificate, it was not *the* public record the defendant was charged with uttering as forged. And here applies with crushing force the doctrine universally maintained by all the writers on criminal law, that when a statute authorizes or creates an instrument not known to the common law, and prescribes its form and impresses upon it peculiar features, in order to support a prosecution for uttering as forged such an instrument, the paper actually forged or uttered as forged must conform to the statutory description. And Bishop says this is true even when the false statutory one is so like the genuine as to be liable to deceive most persons.

It would be an injustice to infer that the Attorney General was unaware of this provision of the statute. In the brief before us it is said, " the paper prepared by the Supervisor of Registration is a paper of a public nature directed to be made by the Legislature, to be certified by officers of the State, and to be carefully sealed up with the other papers, and sent to the officers of the State, who have duties to perform. This paper is evidence that the commissioners of election have transmitted to the supervisor returns as required by law. It is evidence that the officer (the clerk) within a short period has examined these returns and ascertained the result to which he certifies."

The clerk had never certified to the one on which this prosecution is based, and no one else is required to do it, and so, further on it is argued, " that the clerk's certificate although directed by the law to be appended, is not of the substance of this document, but a mere formal matter—a part of the election machinery of the State, and its omission, while rendering the clerk culpable, does not destroy the validity of the record." It is not our concern to reconcile the admission that the paper is evidence that the clerk within a short period has examined the returns, with the assertion that his certificate to their correctness, and to his ascertainment of the result, is a mere formal matter, or in other words, that it means nothing.

State vs. Anderson.

But some of the requirements of election statutes are merely direct-ory, and being so, the question is asked how can it be held, that the absence of this formality (the clerk's certificate) so far changes the sub-stance of this document as to make it inadmissible in evidence under the information. There is no question here of a change of substance of a document because of the absence of a formality, if indeed such a thing be possible, nor is there any question of the effect produced upon the result of an election by the failure to observe certain directions, as to which the universal rule of construction is, that election statutes are to be construed liberally and to favor the right ascertainment of the vote cast, while criminal statutes are by a rule, equally universal, to be con-strued strictly in favor of the party accused. The actual and vital ques-tion here is, having prosecuted the prisoner for uttering as forged a particular statutory instrument, has the State shewn that he did utter as forged that instrument? The State has not shewn it. It may have shewn that the prisoner uttered as forged another and a different instrument, but the decisions of all courts come down to us in an unbroken line of authority, that a conviction can not be sustained under such charge, supported only by such proof.

It is also argued: "It is not sufficient to say that the supervisors' returns was not the paper that the members of the Returning Board were to principally consider, or that it was not the best evidence. The paper was used, and the paper was fraudulently altered and falsified that it might impose upon the public. The paper was successfully used. If this was used in connection with other papers to produce a fraudulent result in their count, and they returned upon its evidence and forged it for that purpose, it makes a case of forgery."

The prisoner was not prosecuted for that crime. He was not charged with forging that paper or any paper for any purpose. One man may forge a paper and another may utter it as forged. The crimes are dis-tinct. The acts are distinct. So far from supposing it was sufficient to say that the supervisors' returns was the paper that the returning offi-cers were principally to consider, or that it was the best evidence, we said, as the statute says, it was not to be considered at all, and that it was not made by the statute any evidence whatever of the actual vote cast. It was not the paper nor one of the papers which the returning officers were to canvass in making their compilation of the vote. Upon that, the directions of the statute are explicit. Whether in the absence or loss of the commissioners' returns, it would not be receivable in an election contest as secondary evidence of the vote cast, or even as good as the best evidence, is a matter of inquiry not relevant to this criminal proceeding. And it must be evident that we can not know as a court, and in a case where we have jurisdiction only of the legal questions,

that the defendant and his co-members of the Returning Board, did in fact make up their compilation from the Supervisors' returns, and successfully used them to produce a fraudulent result. That is a matter of fact, wholly outside of the record, and if it had been in the record could not be taken into account by us in deciding a naked question of law.

"I can not understand the argument," continues the Attorney General, "that pronounces a nullity an official paper which the statute directs shall be made and placed in the hands of public officers, and being of no value or efficacy, may be altered, forged and falsified with impunity." Nor can we. But an acquaintance with the rules governing criminal prosecutions will enable one readily to understand that when a person is charged with *uttering* as forged a particular instrument, he can not be convicted and punished for *forging* another and a different instrument.

So, further on, apparently forgetting what the charge is in this case, and misreading the words of the statute, he argues elaborately to prove what no one will ever dispute, viz.: That whoever may be guilty of forging a public record shall be punishable; and professing to cite the law, says: "the statute is that any person who shall utter and publish as true any false, altered, forged or counterfeited record with intent to defraud any person, shall upon conviction, etc."

Now that is not the statute. The fact is the word *utter* is not in the statute, but *alter* is the word used, and one of the numerous grounds of the motion in arrest of judgment is based upon the variance between the crime defined by the statute and the crime charged in the information.

There is a well-recognized distinction at common law between the offence of uttering a forged instrument, and the offence of uttering and publishing such instrument. The first offence is complete when the party has offered the instrument as good, intending it should be received as good. The last is not complete until the paper has come into the hands of some person other than the felon. The common law crime has been supplemented by statutes in every country, creating statutory offences of this character. In England the words used in the statute to express the passing or putting off a forged instrument to another as a genuine instrument, or an attempt to do so, are, " offer, utter, dispose of, or put off," which embrace every mode of disposing or attempting to dispose of a forged instrument. Waterman's Archbold Criminal Practice and Pleading, 547—26. The words of our statute are, " alter or publish as true," and are not a misprint, for they occur first in the act of 1818, and are repeated in the Revised Statutes of 1856 and 1870. It was hence contended by the defendant's counsel that the Legislature had not made the act charged to have been done by him, a crime—the charge being " uttering and publishing as true," and that

the crime as laid in the information and for which he was tried is not the crime created by the statute. The statute used the word *alter*. The information has *utter*. The statute uses the disjunctive, alter *or* publish, thus making two crimes. The information has the copulative, utter *and* publish, thus describing one offence. The prosecution is based on section 833 Revised Statutes, and the word *utter* is not used in it, while it is employed in the next section, in relation to the intent in passing paper securities, and is used in section 835 for creating another and distinct offence, thus—"whoever shall utter or tender in payment, etc." The two words would appear to have been employed intentionally, and it was urged both in the oral and printed argument that the words "utter and publish," used in the information as descriptive of the crime, do not charge the crime either of altering or publishing defined by the statute. In other words, the statute made it a crime to alter the record, and the defendant was not charged with that. The statute also made it a crime to publish as true an altered record, and the defendant was not charged with that, but with uttering and publishing, etc. The act of uttering is separable and distinct from either of the others, and unless the phrase "utter and publish" means legally the same as the single word "publish" and designates the same act, the offence charged in the information has no existence. If the draughtsman of the information had the statute before him, he must have intended the word 'utter' used by him conjunctively with 'publish' as expressing only what the latter word expresses by itself; but legally that is not true as the law writers all teach. We did not give this objection of the defendant's counsel a place in our former opinion, because among the twenty-seven bills of exception, and the assignment of errors additional thereto, the two on which we rested our decision were conclusive of the invalidity of the proceedings.

That the crime should have been charged to have been committed by the defendant under color of his office is to our minds a necessity. No one but the returning officers had any power, mission, or authority to compile, canvass or publish the returns of elections. The compilation by any other persons, and its publication, could produce no legal consequence. All persons are presumed to know that the publication of the results of an election by any others than the Returning Board was null and void legally, and hence it was legally impossible that such publications should deceive, injure or defraud any one, and since the criminal act must not only be done with intent to defraud, but must be legally capable of effecting the fraud, it must be charged to have been done by virtue of, and in the capacity of the returning officer. We are asked in the brief if "four presidents of banks had appropriated large sums of money to induce the returning officers to make necessary

alterations in the figures, and after the alterations had been made and the result changed, they had caused them to be published," would not they be punishable? Unquestionably, if we understand it to be assumed that the publication is made in the name and under the authority of the returning officers, because there is another statute that applies to those who *procure* to be falsely made, etc. But that is the Attorney General's imaginary case, and not ours. We supposed a case where it is not alleged or charged, and therefore not to be pretended, that the published document bore the certificate of the returning officers, but only that of four bank presidents. It is undeniable that such publication would not be criminal under our statute for the reasons we then gave. We stated that case to shew that it was of the essence of the offence of uttering and publishing false election returns under the statute, that the publishing should be made by persons having authority and capacity under the law to make it, and therefore it was essential that the information should contain an averment of that authority and capacity, and was fatally defective without it. Its omission could not be supplied by the court.

It is matter of history that the act of the defendant, which actually constituted his crime, was done in his official capacity as a member of the Returning Board. Why was it that the canvassing and publishing of the vote to be made by him and his co-returning officers became the object of public anxiety, and when made, became the subject of public condemnation? If four private persons had done what they did, and then published as election returns whatever might have been in conformity to their wishes, would not the act have been treated with derision, and could it have produced any effect, legally or otherwise?

Is it not apparent if this defendant had not been a member of the Returning Board and had published the altered returns, being only a private person, that no one would have thought of prosecuting him for that act? It was because what he did, was done in a recognized official capacity, that the fame and the infamy of it filled men's mouths, and it was for that cause the criminal prosecution was ultimately instituted. Everywhere, in the market place and at the fireside, in the press and in the forum, at the council board and in the legislative hall, the official act is the thing complained of and denounced. The theory of the prosecution throughout, outside of the information, is that the act was done in an official capacity, and therefore defrauded. The argument of counsel, the charge of the Judge, the bills of exception to that charge and to his rulings in the course of the trial, are all based on that assumption. It is that feature that has imparted to this prosecution the interest, and invested it with the character of a State Trial—which gave to the events that then transpired, and to the criminal acts which are a part of them,

State vs. Anderson.

a national importance—and that feature, conspicuous every-where else, is absent alone from the information.

We have been thus careful to rest our decision upon only those principles of law, of the soundness of which there can be no serious question by candid, disinterested and enlightened jurists every-where. There remain now for notice the concluding sentences of the Attorney General's appeal to us to reverse our ruling.

Like him, we are conscious of having been just to the accused, and just to the State. With him, we feel the necessity that our decision shall contain no assertion of principle which can not be successfully defended, and we believe we have now placed that decision upon a basis so unassailable that the rightfulness of our judgment shall commend it to the candid jurist in every land. If this court had yielded to the impassioned and justifiable zeal of the prosecuting officer, or had been swayed by the feeling, natural and spontaneous among all good men, of detestation of a great crime against free government and the rights of the people, and by reason thereof, had permitted its judgment to be clouded by passion, or warped by love of applause, or to be influenced by any consideration, other than its duty with sedulous care to ascertain the law and with firm purpose to apply it, it would be unworthy of the high place it holds in the government of the State. It would argue a deplorable state of public morals, if it could be confidently assumed beforehand in a case such as this, what the decision of a court would be from the known political affiliations or antipathies of its members. It would be a public calamity, the extent of which could not be measured, if a court should prevent the escape of an accused person by torturing the well-settled principles of law, applied through long years to criminal prosecutions with unvarying uniformity, and bend them to the accomplishment of partisan desires.

Rather let it be known of all men that a court can consider neither expediency nor policy—that it can not shape its judgment either to realize the hopes of friends or to quiet the fears of foes—and that judges may abhor a malefactor, and yet refuse to condemn him contrary to the law.

It is therefore ordered that a rehearing is refused, and that our judgment in this cause remain undisturbed.